[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10432

_____

JONATHAN E. PERLMAN,
as court appointed Receiver,

Plaintiff-Appellant,

*versus*

PNC BANK, N.A.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61390-RS

_____

Before WILSON, ROSENBAUM, Circuit Judges, and CONWAY[*], District Judge.

WILSON, Circuit Judge:

Jonathan Perlman, a court-appointed receiver, appeals the district court's dismissal of his aiding and abetting claims on behalf of the companies in receivership (the Receivership Entities) against PNC Bank. The district court granted PNC's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction because it found that Perlman lacked standing to bring those claims. The district court relied on our decision in *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1308 (11th Cir. 2020), which held that the Receivership Entities must have "at least one innocent officer or director" and thus be "honest corporations" for standing purposes. Perlman moved for reconsideration and for leave to amend, but the district court denied both of those motions.

On appeal, Perlman argues that he has standing because he was appointed pursuant to Section 501.207(3) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). According to Perlman, that statute negates the standing requirement in *Isaiah* that a receiver must allege that the Receivership Entities had at least one innocent officer or director. We hold that even assuming that

---

[*]Honorable Anne Conway, United States District Judge for the Middle District of Florida, sitting by designation.

Section 501.207(3) applies, it does not rectify the standing issue in *Isaiah* because it does not expressly address the imputation of wrongful acts between the Receivership Entities themselves and their insiders. Accordingly, we affirm the district court's orders granting PNC's Rule 12(b)(1) motion for lack of subject matter jurisdiction and denying Perlman's motions for reconsideration and leave to amend.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Before we detail the district court proceedings below, we must first introduce a few players involved in this case. At the forefront is Jeremy Marcus, the main perpetrator behind a widespread debt relief scam. Marcus's scheme involved a nationwide enterprise of 85 entities. These entities were controlled by Marcus, and he employed telemarketers at these entities to deceive tens of thousands of consumers into thinking they were being offered low-interest loans to settle their debts. Unfortunately, the consumers did not receive low-interest loans and were left in worse financial positions.

While Marcus lived lavishly for some time, profiting off fraudulently acquired money from his victims, it was not long

---

[1] Since we are reviewing the district court's grant of PNC's facial attack on subject matter jurisdiction, we take the allegations in Perlman's complaint as true. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). Accordingly, these facts come from Perlman's Amended Complaint.

4                    Opinion of the Court                    21-10432

before government enforcement agencies came knocking. The Federal Trade Commission (FTC) and the Florida Attorney General (collectively, the Enforcement Agencies) filed a complaint against Marcus for various consumer fraud violations, referred to as the Enforcement Action. Often in cases involving fraud, an enforcement agency will move to have a court-appointed receiver take control over the defendant's property to ensure that assets are not dissipated or wasted.[2] Given Marcus's record, the Enforcement Agencies thought it would be prudent to have someone other than Marcus responsible for his companies' assets. This is where Jonathan Perlman comes into the story.

In the Enforcement Action, the United States District Court for the Southern District of Florida (the Enforcement Court) entered a temporary restraining order appointing Perlman as the receiver for several of Marcus's companies, the Receivership Entities. Perlman's role in the Enforcement Action was to investigate the affairs of the Receivership Entities and report to the Enforcement Agencies. Perlman's investigation confirmed the Enforcement

---

[2] At the time of the Enforcement Action, the FTC could obtain a court-appointed receiver. But considering the Supreme Court's decision in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), we recently held that a court-appointed receiver is no longer an appropriate equitable remedy under Section 13(b) of the Federal Trade Commission Act. *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021). However, because this case also involved Section 501.207(3) of the FDUTPA, which authorizes the court to appoint a receiver, our holding in *On Point Capital Partners* is not dispositive of this appeal.

Agencies' material allegations against Marcus, who then stipulated to a permanent injunction and a monetary judgment of roughly $85 million.

Turning to the district court proceedings in this appeal, Perlman, acting on behalf of the Receivership Entities, sued PNC in a separate action for its involvement with Marcus's scheme. Relevant to this appeal, Perlman brought claims for aiding and abetting breach of fiduciary duty (Count I) and aiding and abetting conversion (Count II). Perlman alleged that PNC assisted Marcus by providing bank accounts for the Receivership Entities so that Marcus could carry out his scheme. The Receivership Entities were harmed, according to Perlman, because Marcus diverted funds from the Receivership Entities for a non-business purpose, thus breaching his fiduciary duties owed to them and converting their money. In turn, PNC allegedly aided and abetted Marcus by providing banking services, despite many red flags showing Marcus was committing fraud.

Following our decision in *Isaiah*, PNC moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss Counts I and II for lack of subject matter jurisdiction, arguing that Perlman failed to allege the presence of an innocent director or officer for purposes of standing. Notably, Perlman did not move to amend his complaint to include the requisite allegation and thereby attempt to cure the standing issue. Instead, Perlman responded to PNC's motion by arguing that he did have standing, notwithstanding *Isaiah*, because he was appointed under Section 501.207(3) of the Florida

Deceptive and Unfair Trade Practices ACT (FDUTPA), which authorizes a court-appointed receiver "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise . . . ." Fla. Stat. § 501.207(3). Thus, Perlman argued, it is irrelevant whether the Receivership Entities have an innocent director or stockholder because the FDUTPA provides that the wrongful acts of the Receivership Entities are not imputed to the Receiver for standing purposes. In support of his argument that he was appointed under the FDUTPA, Perlman cited to various docket entries from the Enforcement Action.

PNC then replied to Perlman by arguing that he was not appointed under Section 501.207 of the FDUTPA, but rather under Section 13(b) of the Federal Trade Commission Act (FTCA). In support, PNC pointed to the Enforcement Agencies' motion for a temporary restraining order that requested the appointment of a receiver. In that document, the Enforcement Agencies cited only to Section 13(b) as the basis for the Enforcement Court's authority to appoint a receiver. The district court agreed with PNC, also noting that "[n]one of the orders regarding the appointment of the Receiver explicitly state the legal authority for appointment of the Receiver." Then, the district found that "[a] review of the record in the Enforcement Action indicates that [Perlman] was appointed pursuant to section 13(b) of the [FTCA]." The court therefore concluded that *Isaiah* applies and granted PNC's Rule 12(b)(1) motion

to dismiss because Perlman's Amended Complaint contained "no allegations of an honest board member, officer, or shareholder."

Following the district court's dismissal of Counts I and II, Perlman moved for reconsideration and for leave to amend his complaint to allege that he was appointed under the FDUTPA. The district court denied these motions and this timely appeal followed.

## II.  STANDARD OF REVIEW

"In reviewing a district court's dismissal of a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, we review the district court's legal conclusions *de novo*, including the court's conclusion concerning standing." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013).

## III.  DISCUSSION

In *Isaiah*, we raised the issue of whether a court-appointed receiver had standing to bring "common law tort claims against third parties to recover damages for the fraud perpetrated by the corporation's insiders." *Isaiah*, 960 F.3d at 1306.  Applying Florida law, we noted that:

> [U]nless the corporation in receivership has as at least one honest member of the board of directors or an innocent stockholder, the fraud and intentional torts of the insiders cannot be separated from those of the corporation itself and the corporation cannot be said

>to be an entity separate and distinct from the individ-
>ual tortfeasors.

*Id.* We pointed to the distinction "between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a [fraudulent] scheme, which cannot pursue such claims." *Id.* at 1307. For the latter, it is "not the corporation but the individual customers who suffered injury as a result of the [fraudulent] scheme, and who may have rights to pursue claims against third parties that allegedly aided and abetted that scheme." *Id.*

The "axiomatic" principle from *Isaiah* is "that a receiver obtains only the rights of action and remedies that were possessed by the person or corporation in receivership." *Id.* at 1306. If the corporation in receivership is one that is operated for the sole purpose of committing fraud, and thus not an "honest corporation," then that corporation "cannot be said to have suffered an injury from the scheme it perpetrated." *Id.* at 1306. Since the receiver "obtains only the rights of actions and remedies" of the corporation in receivership, it follows that the receiver likewise would not have suffered an injury for purposes of bringing such claims.

Even though the district court did not address Section 501.207(3) of the FDUTPA, that statute does not impact the requirement that Perlman must allege the presence of at least one innocent director or stockholder. Without such an allegation, the tortious acts committed by Marcus cannot be separated from the

Receivership Entities and the Receivership Entities could not have suffered an injury.  Section 501.207(3)'s language that a receiver may bring actions without regard to the wrongful acts of the defendant enterprise does not correct this deficiency in Perlman's complaint.

Like the receiver in *Isaiah*, Perlman is bringing Florida common law tort claims against a third party for aiding and abetting breach of fiduciary duty and conversion.  For Perlman to have standing, the Receivership Entities must have suffered an injury. However, if there is no innocent director or stockholder in those Receivership Entities, then the wrongful acts of Marcus cannot be separated from the Receivership Entities and the Receivership Entities cannot be said to have suffered an injury.

Perlman concedes that he cannot include an allegation of an innocent director or stockholder in his complaint.  *See* Oral Argument Recording at 7:44–7:52.  Thus, we must determine if Section 501.207(3) cures this deficiency.  The relevant provision provides:

> Upon motion of the enforcing authority . . . the court may make appropriate orders, including but not limited to, appointment of a . . . receiver . . . to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise.

Fla. Stat. § 501.207(3).

A plain reading of this statute tells us three things. One, Section 501.207(3) provides that a receivership is an appropriate remedy in an enforcement action involving violations of the FDUTPA. Two, the court can appoint a receiver to bring actions on behalf of the Receivership Entities. Three, the receiver may bring those actions notwithstanding any wrongful conduct by the Receivership Entities or their insiders.

What that statute does not tell us, however, is whether the wrongful acts of an insider (in this case, Marcus), can be separated from the Receivership Entities themselves. As we noted in *Isaiah*, unless the wrongful conduct of the insiders can be separated from the entities in receivership, by way of an innocent director or stockholder, then the entities cannot be said to have suffered an injury. Perlman argues that the phrase "without regard to any wrongful acts that were committed by the enterprise" acts to separate the wrongful conduct from the companies. *See id.* However, that statutory language does not address the relationship between a corporation's insiders and the corporation itself. Instead, it only addresses the relationship between the receiver and the corporations in receivership or insiders of those corporations.

Perlman does not cite to any cases interpreting Section 501.207(3), so we are limited to the plain language of the statute. While the statute might provide that the wrongful acts of the Receivership Entities are not imputed to Perlman, this does not change the fact that absent an allegation of an innocent director or stockholder, the Receivership Entities cannot be said to have

suffered an injury for purposes of common law tort claims against third parties.   Therefore, even assuming that Perlman was appointed as a receiver under Section 501.207(3), that statute does not change the outcome of this case.

## IV. CONCLUSION

While the parties spend much of their briefs disputing the applicability of Section 501.207(3) of the FDUTPA, we assume for purposes of this appeal that the statute applies.   However, we hold that Section 501.207(3) does not overcome *Isaiah*'s mandate that Perlman must allege the presence of at least one innocent director or stockholder to have standing to bring his aiding and abetting claims against PNC.   Accordingly, we affirm the district court's dismissal of those claims.[3]

**AFFIRMED.**

---

[3] Perlman's motion to supplement the record and motion to dismiss the appeal for lack of standing and subject matter jurisdiction, which have been carried with the case, are DENIED.   We need not consider the supplemental records submitted in order to resolve this case.   Further, PNC's argument that the Supreme Court's decision in *AMG Capital* deprives this court of subject matter jurisdiction is without merit.   This case is distinguishable from *AMG Capital* because it involves not only Section 13(b) of the FTCA, but also Section 501.207(3) of the FDUTPA, which authorizes the court to appoint a receiver.

ROSENBAUM, Circuit Judge, Dissenting:

"Corporations are creatures of state law." *Burks v. Lasker*, 441 U.S. 471, 478 (1979). So it makes sense that "corporate law is overwhelmingly the province of the states." *Freedman v. magicJackVocaltec Ltd.*, 963 F.3d 1125, 1132 (11th Cir. 2020) (citation and quotation marks omitted). And here, the State of Florida spoke clearly in 2006, when it amended Florida Statutes § 501.207(3) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") to effectively define a corporation in the hands of a Florida receiver as a different entity (for purposes of standing in FDUTPA-authorized claims) than the alter-ego corporation that preceded the receivership's existence and participated in the fraud.

Most respectfully, the Majority Opinion's reading of the amended language to the contrary deprives the language of function and renders it surplusage. I would conclude that the Receivership Entities here, as led by Receiver Perlman, have sufficiently alleged that PNC's acts injured them and that they therefore enjoy standing to sue PNC for aiding and abetting Marcus's breach of fiduciary duty and aiding and abetting Marcus's conversion of the

2                    ROSENBAUM, J., Dissenting                    21-10432

Receivership Entities' property.[1]   Because the Majority Opinion does not reach this same conclusion, I respectfully dissent.

I.      **Under Florida law, in 2003, *Freeman* established the rule that a receiver acting on behalf of a former alter-ego corporation lacks standing to pursue claims against third parties who allegedly aided and abetted the former alter-ego corporation in its intentional torts.**

To explain why Perlman has standing to pursue claims on behalf of the Receivership Entities against third parties who allegedly aided and abetted the corporations in their wrongful acts before they entered receivership, we must begin with *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550 (Fla. Dist. Ct. App. 2003).  In *Freeman*, the Grazianos had perpetrated a Ponzi scheme through their company called NorthAmerican.  *See id.* at 545–46. The state trial court appointed Freeman as a receiver for the Ponzi scheme.  *Id.* at 546.  Freeman then filed suit against third parties whom he alleged had helped the Grazianos and NorthAmerican perpetrate their fraud.  *See id.* at 546–48.  Among other claims, Freeman alleged that the third parties aided and abetted the Grazianos' and NorthAmerican's fraud and the Grazianos' breaches of fiduciary duties to NorthAmerican.  *Id.* at 548.

---

[1] The Majority Opinion does not address the causation and redressability prongs of standing, but as I explain later in this dissent, they are also satisfied here.

21-10432          Rosenbaum, J., Dissenting                    3

The Florida intermediate appellate court affirmed the trial court's dismissal of Freeman's claims because it concluded that Freeman, as receiver, stood in the shoes of the Grazianos and NorthAmerican. *See id.* at 550–53. As the Grazianos and NorthAmerican could not have been said to have suffered an injury from the scheme they themselves perpetrated, the Florida court reasoned, neither could Freeman. *See id.*

In reaching this conclusion, the court recognized that, "[a]lthough a receiver receives his or her claims from the entities in receivership, a receiver does not always inherit the sins of his predecessors." *Id.* at 550. For instance, the court pointed to actions that the corporation, through the receiver, could bring directly against the principals or the recipients of fraudulent transfers of corporate funds to recover assets rightfully belonging to the corporation and taken before the receivership. *Id.* at 551. As the court explained, the corporation could bring those types of actions because it is considered "'cleansed' through receivership." *Id.*

But in *Freeman*, the court stated that was not the case when the predecessor corporation served as the "alter ego" of the wrongdoers, without a true separate corporate identity. In that situation, the court continued, Florida law attributed the bad acts of the predecessor alter-ego corporation to the receiver. *Id.* at 551. As the court explained, when "the entities in receivership do not include a corporation that has at least one honest member of the board of directors or an innocent stockholder" (and unlike when the receivership entities do have an honest member or stockholder), it could

not "perceive a method to separate the fraud and intentional torts of the insiders from those of the corporation itself." *Id.* at 551. As a result, the court concluded that only the victims of the Ponzi scheme suffered injuries, so only they "may have rights to pursue a claim against" the third parties for resulting damages. *Id.* at 553. In other words, the corporation was not "cleansed" for purposes of such causes of action, and Freeman, as the receiver of the alter-ego corporation NorthAmerican, did not have standing to seek damages from third parties for injuries NorthAmerican allegedly helped the third parties to inflict upon itself.

II.   **The Florida legislature amended Florida Statutes § 501.207(3) in 2006 to ensure that a receiver acting on behalf of a former alter-ego corporation had standing to pursue claims against third parties who allegedly aided and abetted the former alter-ego corporation in carrying out its intentional torts.**

The Florida legislature apparently was not fond of *Freeman*'s conclusion that receivers of predecessor alter-ego corporations could not pursue a cause of action against third parties because they stood in the predecessor corporation's shoes. So in 2006, the Florida legislature amended § 501.207(3) of FDUTPA to enable a receiver "to pursue an action under [FDUTPA] on behalf of a defendant corporation in receivership against a third party who played some role in the alleged wrongdoing." Fla. Sen. Judiciary Comm. Fla. Staff Analysis, S.B. 202 (Apr. 21, 2006) § III. Effect of Proposed Changes. Towards that end, the Florida legislature

21-10432          ROSENBAUM, J., Dissenting          5

added the words, "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" to § 501.207(3).[2]

Obviously, the Florida legislature went to the trouble of adding these words to § 501.207(3) to change the effect of the statute.

---

[2] The emphasized portions below show the changes that the 2006 amendment made to § 501.207(3):

> (3) Upon motion of the enforcing authority or any interested party in any action brought under subsection (1), the court may make appropriate orders, including, but not limited to, appointment of a general or special magistrate or receiver or sequestration or freezing of assets, to reimburse consumers or governmental entities found to have been damaged; to carry out a transaction in accordance with the reasonable expectations of consumers or governmental entities; to strike or limit the application of clauses of contracts to avoid an unconscionable result; ***to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise***; to order any defendant to divest herself or himself of any interest in any enterprise, including real estate; to impose reasonable restrictions upon the future activities of any defendant to impede her or him from engaging in or establishing the same type of endeavor; to order the dissolution or reorganization of any enterprise; or to grant legal, equitable, or other appropriate relief. The court may assess the expenses of a general or special magistrate or receiver against a person who has violated, is violating, or is otherwise likely to violate this part. Any injunctive order, whether temporary or permanent, issued by the court shall be effective throughout the state unless otherwise provided in the order.

6                    ROSENBAUM, J., Dissenting              21-10432

If the statute functioned the way the Florida legislature wished it to, the legislature would have had no reason to amend it. So the words "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" must have altered the effect of the statute from what it was before the amendment.

After all, when we construe a statute, we "first consider[] the text of the statute." *Nunes v. Herschman*, 310 So. 3d 79, 81 (Fla. Dist. Ct. App. 2021). And "a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." *Heart of Adoptions, Inc. v. J.A.*, 963 So. 2d 189, 198 (Fla. 2007) (citation and quotation marks omitted). So we must consider the text of the statute both before and after the amendment and give effect to the change.

As I have noted, before the amendment, *Freeman* held that a receiver acting on behalf of a former alter-ego corporation could not bring claims against third parties for allegedly contributing to the former alter-ego corporation's intentional torts because the former alter-ego corporation's bad acts were attributed to the receiver. On the other hand, a receiver acting on behalf of a corporation who had at least one innocent director or owner could bring such claims because Florida courts viewed the corporation in that situation to have been "cleansed" by the appointment of the receiver.

21-10432            Rosenbaum, J., Dissenting                7

The addition of the words "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" in no way change the receiver's abilities or alter his standing in the second (non-former-alter-ego corporation) scenario. Nor is it clear to me that these words otherwise have any effect *unless* they change the ability of the receiver in the first situation to bring claims on behalf of the former alter-ego corporation against third parties for allegedly aiding and abetting the former alter-ego corporation's intentional torts. After all, the added text specifies that a receiver acting on behalf of a corporation is empowered "to bring actions in the name of and on behalf of the defendant enterprise, *without regard to any wrongful acts that were committed by the enterprise.*" Fla. Stat. § 501.207(3) (emphasis added). In other words, the Florida legislature effectively redefined corporate law to recognize that a receiver's appointment essentially cleanses not only those corporations that have at least one innocent director or shareholder but also those that do not, for purposes of a receiver's ability to bring claims in the name of the former alter-ego corporation.

But the Majority Opinion's interpretation of the amendment renders the amendment a nullity and contradicts the amendment's plain language. In the Majority Opinion's view, the amendment "tells us three things":

> One, Section 501.207(3) provides that a receivership is an appropriate remedy in an enforcement action involving violations of the FDUTPA. Two, the court

can appoint a receiver to bring actions on behalf of
the Receivership Entities.  Three, the receiver may
bring those actions notwithstanding any wrongful
conduct by the Receivership Entities or their insiders.

Maj. Op. at 9–10.  As *Freeman* shows, the first and second items
that the Majority Opinion identifies were the case before the
amendment.  So under the Majority Opinion's reading of the
amendment, these two things fulfill no function.

And the way the Majority Opinion reads the third—to au-
thorize the receiver to bring actions on behalf of only those corpo-
rations that had at least one innocent director or shareholder—pro-
vides for precisely the same state of the law as when *Freeman* is-
sued and before the Florida legislature amended § 501.207(3).  Put
another way, the Majority Opinion reads the 2006 amendment to
do nothing.  That cannot be right.  *See Heart of Adoptions, Inc.*,
963 So. 2d at 198.

The amendment must have some function.  *Id.*  In my view,
the plain language, as I have explained, identifies that function:  to
enable the receiver of a former alter-ego corporation to bring
claims against third parties for allegedly aiding and abetting the for-
mer alter-ego corporation's intentional torts.

The legislative history of the amendment to § 501.207(3)
confirms this understanding.    The Florida Senate Judiciary

21-10432             ROSENBAUM, J., Dissenting             9

Committee Staff Analysis[3] accompanying the bill that amended § 501.207(3) notes that, under *Freeman*, "if the [predecessor] corporation would not have had a claim against a third party,[] a receiver could not pursue a cause of action—regardless of whether a creditor could pursue a claim against the third party—even if such a suit might benefit the creditors." *Id.* § II. Present Situation (citing *Freeman*, 865 So. 2d at 548). So for instance, as the Staff Analysis recognizes, under *Freeman*, "if the corporation in receivership, itself, could not bring the claims because of unclean hands, then the receiver is in no better position to pursue such claims." *Id.* at n.16.

Thus, the Florida legislature's awareness of *Freeman* and its effects indicates that the Florida legislature added the phrase "in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" to § 501.207(3) to correct the problem it perceived with *Freeman*'s statement of Florida corporate law as it pertained to receivers of alter-ego corporations. *See id.* § III. Effect of Proposed Changes. Indeed, the amended language "provide[s] standing to the receiver to pursue an action for the defendant corporation in receivership,

---

[3] Of course, the Florida Senate Judiciary Committee Staff Analysis states that it "does not reflect the intent or official position of the bill's introducer or the Florida Senate." Fla. Sen. Judiciary Comm. Fla. Staff Analysis, S.B. 202 (Apr. 21, 2006) § VII. Related Issues. But the Staff Analysis simply makes historical statements of fact about *Freeman* and its effects, so it is helpful to understanding the context in which the Florida legislature amended § 501.207(3).

regardless of whether the defendant corporation had a part in the wrongdoing." *Id.*

III.    Given the amendment to § 501.207(3), no impediments exist to the Receiver's standing to bring claims against PNC for aiding and abetting Marcus's intentional torts.

Of course, my analysis above is only part of the story because the Florida legislature can't provide Perlman with Article III standing by amending a state statute, if Article III standing doesn't otherwise exist. Standing is, after all, a constitutional requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (holding that a statutory violation, without more, did not give rise to Article III standing). But here, the Florida legislature has merely altered the state law under FDUTPA about the receiver's position relative to a former alter-ego corporation for which he now acts. While before the amendment, the receiver stood in the shoes of the former alter-ego corporation for purposes of bringing claims against third-parties that contributed to the former alter-ego corporation's wrongdoing, the amendment renders the former alter-ego corporation acting under the receiver now "cleansed" from the corporation's prior existence. In short, the Florida legislature effectively revised how it defines a corporation after a receiver takes over a former alter-ego corporation.

Because the Florida legislature's amendment to § 501.207(3) addresses only legal standing, not Article III standing, as long as Perlman satisfies Article III standing requirements, under § 501.207(3), he has standing to proceed against PNC. And here,

Perlman has sufficiently pled all three elements of constitutional standing: "(1) an injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is redressable by a favorable decision." *Laufer v. Arpan, LLC*, 29 F.4th 1268, 1272 (11th Cir. 2022).

First, Perlman has alleged a legally protected interest which is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). Perlman says he (on behalf of the Receivership Entities) was injured financially when PNC aided and abetted Marcus in withdrawing money from the Receivership Entities' accounts. That injury is "actual"—it already happened—and "concrete" because Perlman alleges that he was deprived of money, the quintessential concrete harm. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc) ("Tangible harms are the most obvious and easiest to understand; physical injury or financial loss come to mind as examples."). It is also "particularized" because it is Perlman's money, not that of the public at large. *Spokeo*, 578 U.S. at 339 ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'").

Second, Perlman's injury is directly traceable to PNC's alleged conduct—opening accounts for Marcus even after he was kicked out of other banks and even after PNC knew that Marcus was operating a fraudulent debt relief business. And third, that injury is redressable because if Perlman succeeds, the Receivership Entities will recover the money that PNC and Marcus stole.

*Isaiah* does not require a different conclusion. *Isaiah* applied the general Florida common-law principle that the receiver stands in the shoes of the corporation, as *Freeman* describes and which I outlined above. *Isaiah*, 960 F.3d at 1302. But significantly, *Isaiah* wasn't a FDUTPA case—it was a Florida Uniform Fraudulent Transfer Act ("FUFTA") case. And unlike with FDUTPA, which the Florida legislature amended to correct a problem it perceived after *Freeman* issued, the Florida legislature made no similar amendment to FUFTA. So the *Isaiah* panel had no basis to find that Florida endowed the receiver with standing under the facts of that case. But here, where the Florida legislature has broadened the rights of a receiver to sue, *Isaiah*'s holding isn't binding. *Id.*

## IV

Because the amendment to § 501.207(3)'s text endows the receiver of a former alter-ego corporation with standing to bring claims against third parties that have allegedly contributed to the former alter-ego corporation's intentional torts, I would vacate the district court's dismissal of this case. I therefore respectfully dissent.